154 So.2d 181 (1963)
Alfred G. ZABEL and David H. Russell In re Bulkhead, Dredge and Fill Application No. 80, Appellants,
v.
PINELLAS COUNTY WATER AND NAVIGATION CONTROL AUTHORITY, Appellee.
No. 2935.
District Court of Appeal of Florida. Second District.
May 17, 1963.
Rehearing Denied June 14, 1963.
*182 Ed W. Harris, St. Petersburg, for appellants.
Page S. Jackson, Clearwater, for appellee Pinellas County Water and Navigation Control Authority.
Byron T. Sauls of Fisher, Sauls, Fisher, Anderson & Adcock, St. Petersburg, amicus curiae.
KANNER, Judge.
Plaintiffs-appellants, Alfred G. Zabel and David H. Russell, petitioned the Pinellas County Water and Navigation Control Authority, defendant-appellee, pursuant to section 253.122, Florida Statutes, F.S.A., and chapter 31,182, Special Acts, 1955, Laws of Florida, requesting that it fix a bulkhead line and grant them a dredge and fill permit for approximately 11.5 acres of bottom land in Boca Ciega Bay. An examiner appointed by the Authority recommended denial of appellants' application. Appellants filed exceptions; and, upon their appeal to the Authority, the examiner's findings of fact and recommendations were confirmed.
After subsequent petition for rehearing had been denied, recourse was had to the Circuit Court of Pinellas County, Florida. First, the cause was heard on the merits, with a view of the site being had by the judge in the presence of the respective counsel; then there was a hearing upon the subject of whether or not appellants were precluded from attacking the constitutionality of the laws mentioned. By final decree, the court held the Authority to have been correct in its confirmance and found additionally that appellants had elected their remedy and had estopped themselves from urging unconstitutionality of the acts under which they were at the same time *183 seeking relief. In view of the latter holding, no hearing was had by the trial judge nor ruling made upon the subject of constitutionality. The appeal from the final decree deals both with the adjudication on the merits and with the constitutional aspects as these were treated by the court below.
We consider at the outset that portion of the circuit court's decretal determination dealing with the merits of the cause.
Appellants are owners and operators of a large trailer park situated on upland property comprising approximately 15.8 acres of land along the shore of Boca Ciega Bay. The proposed fill originally was for approximately 15.8 acres. During the course of the hearings, appellants amended their plan so that there would be a fill of around 11.5 acres and so that there would be an opening of some seventy feet and a bridge connecting the fill with the upland. Purpose of the proposed fill was for extension of the trailer park to create additional water front lots for trailers and to provide sufficient depth surrounding the area for access of the trailer park occupants by boat to the deep water channel of the west coast intra-coastal waterway in Boca Ciega Bay. The bottom land to be filled and the land from which the fill was to be taken are owned by appellants. Considerable filling and dredging had previously been accomplished along neighboring portions of Boca Ciega Bay; and before the enactment of the law as to dredging and filling, appellants had already made one fill and established a sea wall along it.
The examiner, appointed by the Authority personally surveyed on several occasions the proposed development site, both by automobile and by boat. He also spent several days conducting hearings and taking testimony. During the course of the proceedings, certain expert witnesses testified on behalf of appellants, while 200 objectors represented by 15 witnesses resisted issuance of the permit.
Evidence presented by appellants had as its primary objective justification of their project through showing that it conformed to the eight requisites specified by section 8(e) of chapter 31,182.[1] Thus, they sought to demonstrate both that no material adverse effects would accrue through execution of their plan and that there would be certain positive benefits. Motion pictures taken personally by appellants depicted the unsightly condition of their own bottom land as compared to adjoining portions of the water front, which were shown to be in use for fishing and other recreational pursuits.
The gist of the expert testimony, that of a marine biologist and two professional engineers, was that, because of sparse bottom vegetation and resultant dearth of marine life in the area, the proposed dredging and filling would not be detrimental in this regard; that the plan would not result in stagnant pockets, silting or shoaling of channels, erosion, or obstruction of tidal flow and that the project would *184 aid water transportation, boating, use of waterways and navigable waters and would protect upland owners from storm damage. There were admissions that a more abundant amount of water ebbing and flowing over the bottom is healthful for fish, that diminution of it might have helped reduce vegetation, that more filling could result in more damage to marine life, that previous fills had reduced the tidal prism, which could also be reduced further by the proposed plan, with a consequent lessening of the amount of water ebbing and flowing, and that navigation would be detoured about 2,300 feet by the purported changes. Additionally, there was the acknowledgment by one of the engineering experts that, since the extensive filling has eventuated in the area, the shoaling in Blind Pass has been more pronounced and that the water from the fill area proposed would go out Blind Pass. Two of the expert witnesses voiced the opinion that so much damage had been done by previous fills that little more could ensue.
In opposition, the witnesses for the objectors interposed vigorous and uniform protests against the permit, based upon the premise that its execution would complete the existing damage which had already been done to fishing, bathing, beach, and scenic qualities of the subject area of Boca Ciega Bay as these affect the livability, enjoyment, and freedom from various asserted adverse effects. The general tenor of their statements was that these once beautiful and pleasant surroundings for living and recreational pursuits had steadily deteriorated as various portions along the bay front had been filled and dredged, with attendant disappearance of marine life, fouling of the beaches, water, and air, restriction of navigation, obstruction of the passage of free water, slowing of the tidal flow, and depreciation in value of residential properties.
At the close of all hearings, receipt of evidence and other data, the examiner submitted his findings and recommendations. From the testimony and his personal inspections, he found the applicants had failed to establish that the proposed plan would have no adverse effect on use of the waters of Pinellas County for transportation, recreational or other public purposes, flow of water or tidal currents, erosion and shoaling of channels in the area affected and had further failed to establish there would be no adverse monetary or other effect upon the uplands surrounding or necessarily affected by the plan.
Principally, the appellants urge that the Authority acted upon the report of the examiner based upon a finding of insufficient evidence to establish the statutory conditions necessary for issuance of a permit. Chapter 31,182, they assert, provides for refusal of the permit only where it is shown the proposed fill will have a material adverse effect. It is their position that the evidence demonstrates there would be no material deleterious results and that it further indicates certain public benefits which would be achieved, as well as benefits to the other riparian owners.
The Authority whose action was challenged before the circuit court is an administrative body consisting of the members of the Board of County Commissioners of Pinellas County. Section 253.122 authorizes establishment of bulkhead lines by local governing bodies, offshore from lands or islands bordering on or being in the navigable waters of the county as defined in section 253.122, "beyond which a further extension creating or filling of land or islands outward into the waters of the county shall be deemed an interference with the servitude in favor of commerce and navigation with which the navigable waters of this state are inalienably impressed." By chapter 31,182, the Authority is empowered to regulate and exercise control over the dredging and filling of all submerged bottom lands in Pinellas County such as those owned by appellants. Section 8, subsection (e) delineates the eight factors to be determined by the Authority in considering an application and states that the purpose is to prevent undesirable *185 situations which might result from the promiscuous and uncontrolled filling of bottom land or the excavating of basins or channels without regard to what the effects of this might be. To that end, the Authority is directed to obtain such engineering or other data and to hear such testimony under oath as may be necessary to determine the results as specified under the eight points mentioned. Section 9, authorizes, where the board deems necessary, appointment of an examiner to conduct such hearings as are provided for in the chapter. Subsection (f) states that the Authority shall consider any duly filed exceptions to the examiner's report, the record of testimony taken before the examiner, without presumptions as to the examiner's findings of fact, the engineering and other data. The Authority then shall either confirm the report or enter such other determination as is proper.
The Authority ruled under the latter alternative and so denied appellants' application. Appellants were the proponents; the objectors resisted. Each submitted evidence relating to the eight statutory prerequisites; it is obvious that the determination made was that the proposed plan would produce materially adverse effects. We conclude that the circuit court's final decree upon the merits of the cause must be affirmed.
As heretofore noted, the circuit judge decided that estoppel would lie so as to prohibit appellants from seeking relief under the general and special laws and attacking their validity in the same proceeding. It will be recalled that appellants, at their first opportunity, upon appearance before the circuit court, interposed the issue of constitutionality of these statutes.
In cases involving constitutional law, estoppel is most often applied where, in some manner, persons share in advantages granted under statutes. It is well established that one who voluntarily proceeds under a statute and claims benefits conferred by it may not question its constitutionality in order to avoid its burdens. 11 Am.Jur., Constitutional Law, section 123, page 767.
A Florida case wherein the appellees and amicus curiae urged estoppel of the appellant to question the constitutionality of an act is that of Lipe v. City of Miami, Fla. 1962, 141 So.2d 738. Asserted basis for estoppel was acceptance by appellant, a city employee, of promotion to the office of chief of detectives and the benefits of it. The record did not indicate that this question was before the trial court; for this reason, the supreme court refused to consider it. The comment was made, however, that appellant was under no obligation to assault the validity of the act until he was adversely affected by it. "This," said the court, "he did at the first opportunity." The court did not sustain estoppel.
There is an important qualification to the general doctrine of waiver or estoppel to assert the invalidity of a law. This exception applies where a statute imposes a duty which is mandatory in form, accompanied by penalties for failure to obey its provisions. In this class of cases, there is lacking the ingredient of voluntary action necessary to waiver or estoppel. 11 Am. Jur., Constitutional Law, section 124, page 771.
Section 253.122, Florida Statutes, F.S.A., deals with the power of local governing bodies to establish bulkhead lines, while chapter 31,182, delineates the power of the Authority and the procedure to be followed upon application for a permit to dredge and fill. The latter act specifies that a permit shall be acquired before one can perform such a project upon his land and contains the penal proscription of a misdemeanor for any violation under it.
Appellants through their predecessors had title to the bottom lands in question prior to the arising of the limitations as to filling and developing set out through these acts. No benefits have been conferred upon appellants by the laws assailed; rather, the permit which they were required to seek was denied, as well as the fixing of the *186 bulkhead line requested. As stated, appellants raised the question of constitutionality upon their initial appearance before the circuit court subsequent to their failure to prevail before the Authority.
We must conclude that the trial judge erred in that portion of his decree finding, under the doctrine of election of remedies and estoppel, that appellants were barred from testing the constitutionality of the general and special laws. It follows that the constitutional issue should have been considered and resolved.
The subject of constitutionality was directly raised below, was not ruled upon because of the estoppel feature; and the matter is now in a status of suspension, in view of our holding that estoppel does not lie. The constitutional questions are raised through assignments of error on the appeal, were argued orally before this court and in the briefs of the respective parties. The full record is before this court, as it was below. In the interests of obviating the more protracted and expensive method of remanding for further proceedings, this court will deal initially with the matter of constitutionality. Article V, section 4(2) of the Constitution of the State of Florida, F.S.A. and Rule 2.1(a) (5) (b), Florida Appellate Rules, 31 F.S.A. set out that "Appeals from district courts of appeal may be taken to the Supreme Court, as a matter of right, only from decisions initially passing upon the validity of a state statute * *".
Unconstitutionality of the acts under attack is predicated upon certain basic rights under the federal and state constitutions which appellants assert have been invaded. The planned extension of their trailer park, they say, is the only reasonable use to which their lands can be put; the result cited is taking of their land without due process of law and without just compensation. The conveyance from the state, it is contended, is presumptively valid under the facts existing at the time of the conveyance, since the state parted with title prior to passage of the restrictive acts. Appellants argue that the enactments therefore constitute an impairment of their contractual rights and an unlawful delegation of legislative authority.
Appellees contend that the statutes in question are consonant with recognized burdens of certain rights, privileges, and usages guaranteed to the riparian owner and other citizens of Florida with respect to bottom lands purchased from the state.
Full enjoyment of property by its owner may be interfered with under the police power only if the need for interference is clear. However, in the interests of public welfare, a property owner must submit to reasonable regulations and limitations upon the use of his property; and in case of conflicts in such matters, private interests must yield to public welfare. Thus, there is no constitutional guaranty which secures property rights against reasonable and just statutory regulations, restraints, and prohibitions duly administered to conserve the public interests affected by them. Considerations of financial loss or of so-called "vested rights" in private property are not sufficient to prevail over the need for lawful exercise of the police power. 6 Fla. Jur., Constitutional Law, section 192, pages 427, 428. Rather, as the principle is set out in section 191 of this same authority, the constitutionally guaranteed fundamental rights of persons and property are subject to the police power, and loss or impairment of such rights through the proper exercise of it need not be compensated.
The following two cases concern Boca Ciega Bay. In Hayes v. Bowman, Fla. 1957, 91 So.2d 795, the Florida Supreme Court, affirming declaratory judgment of the Circuit Court of Pinellas County, held that grantees of submerged lands in Boca Ciega Bay from the Trustees of the Internal Improvement Fund did not, by the proposed fill, invade common law riparian rights of upland owners where such owners would still have a direct, unobstructed view of the bay in the direction of the channel as well as a direct and unobstructed means of *187 ingress and egress to the channel of the bay. The court, however, 91 So.2d at page 799 reiterated certain basic principles relating to public rights and riparian rights:
"Subject to certain statutory variations which we hereafter point out, it is well settled in Florida that the State holds title to lands under tidal navigable waters and the foreshore thereof (land between high and low water marks). As at common law, this title is held in trust for the people for purposes of navigation, fishing, bathing and similar uses. Such title is not held primarily for purposes of sale or conversion into money. Basically it is trust property and should be devoted to the fulfillment of the purposes of the trust, towit: the service of the people.
"However, consonant with the common law rule, the State may dispose of submerged lands under tidal waters to the extent that such disposition will not interfere with the public's right of navigation, swimming and like uses. Moreover, any person acquiring any such lands from the State must so use the land as not to interfere with the recognized common law riparian rights of upland owners (an unobstructed view, ingress and egress over the foreshore from and to the water)."
Still more recent is the case of Gies v. Fischer, Fla. 1962, 146 So.2d 361, passing upon constitutionality of one of the laws here involved, section 253.122, Florida Statutes, F.S.A., authorizing local governing bodies to fix offshore bulkhead lines. Pursuant to provisions of the act, the Pinellas County Water and Navigation Control Authority set a bulkhead line over and precluding filling upon a portion of submerged lands owned by those appellants in Boca Ciega Bay. The circuit court, on appeal, had reversed the action of the Authority and had construed section 253.122 to authorize establishment of such a bulkhead line only at a point where "a further extension of land or islands outward would be an interference with the servitude in favor of commerce and navigation" and remanded the cause, permitting re-establishment of the bulkhead line across appellant's property, provided there be strict adherence to legal standards preventing interference with the public rights. The Florida Supreme Court, on direct appeal of the appellants challenging the circuit court's decree as a decision directly passing upon and sustaining the validity of the act against attack on constitutional grounds, agreed that, as applied by the chancellor, the act is not unconstitutional. Said the court:
"The objections to the decree upon constitutional grounds are necessarily premised upon a contention that the statute could not lawfully authorize the establishment of a bulkhead line, for any reason, upon submerged lands to which appellants hold title by deraignment from a duly confirmed conveyance from the trustees of the internal improvement fund to their predecessors.
"We think, however, that the limitations of the act as construed place it squarely in line with the decisions defining the nature of the state's title in sovereignty lands in general, and the restrictions inherent in its power of alienation. A conveyance of such lands will, of course, to the full extent of the grantor's power, vest in the purchaser the rights of use and control normally accompanying title, and the doctrine of estoppel, applied heretofore against the trustees in this field, may further bolster title to areas where fill operations have been accomplished. Even if, however, that doctrine should operate in the latter situation to cut off all residual public rights, or create a conclusive presumption that the public servitudes were not at the time impaired so as to require that any subsequent impairment be corrected only by exercise of the power of eminent domain, we find that in the circumstances of this case the doctrine cannot prevent enforcement of the controverted statute.

*188 "Under the rule of the cited cases there can be no doubt that in the absence of some overriding necessity a conveyance of public lands or rights in lands which actually results in the impairment of the public servitudes, referred to in the statute here involved, must fail. Tested by that principle, no rights lawfully vesting under previous conveyances will be infringed by a proper application of this legislation, and whether it is sustained as police regulation or an exercise of retained power under the trust doctrine governing sovereign lands, the decree appealed in this case should be affirmed."
Thus, by the cited authorities, it may be seen that in proper circumstances, reasonable regulations and limitations upon use by a property owner of his property may be imposed and utilized through legislation in the interests of the public welfare via the police power. Also, where the state has conveyed submerged lands, the recognized public rights and riparian rights reserved under the trust doctrine governing sovereignty lands are entitled to protection.
Chapter 31,182, Special Acts, 1955, under section 8, supplies eight criteria to be utilized by the Authority in considering an application such as that made by appellants. These criteria are designed to fulfill the purposes for which the Authority was created, to provide for adequate regulation and control of waters in the county and their alteration "* * * in the interest of public rights, public welfare, protection of public riparian property rights and the preservation of the natural beauty and attractiveness * * * and to aid and assist boating activities and navigation * * *". See section 2, chapter 31,182. The purpose of the criteria themselves is to prevent undesirable situations which might result from the promiscuous and uncontrolled filling of bottom land or the excavating of basins or channels without regard to what the effects might be. See section 8(e).
This court has been concerned only with the particular factual situation with respect to the specific plan which was rejected, and not any other plan. As applied to this situation, even though title to the submerged lands had been acquired prior to passage of the acts protested, we hold that these laws are constitutionally valid. That portion of the circuit court's decree adjudicating the merits of the cause is affirmed; that part sustaining estoppel is reversed; and the cause is remanded for revision of the estoppel holding and for decretal disposition by amendment sustaining the constitutionality of the laws in conformance with this opinion.
Affirmed in part, reversed in part, and remanded for revision.
SHANNON, C.J., and SMITH, J., concur.
NOTES
[1] "1. The effect of the proposed plan or development on the use of said waters in said county for transportation and recreational or other public purposes and public conveniences.

"2. The effect of the proposed plan or development on the free use of the waterways and navigable waters.
"3. The effect of the proposed plan or development upon erosion control.
"4. The effect of the proposed plan or development upon the flow of water or tidal currents in said county.
"5. The effect of the proposed plan or development upon erosion, shoaling of channels, formation of stagnant pockets likely to collect debris and upon extraordinary storm damage.
"6. The effect of the proposed plan or development upon the natural beauty and recreational advantages of Pinellas county.
"7. The effect of the proposed plan or development upon the conservation of wild life, marine life, and other natural resources.
"8. The effect of the proposed plan or development upon the uplands surrounding or necessarily affected by said plan or development."